IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 17, 2000 Session

**STATE OF TENNESSEE v. CHARLES A. REYNOLDS**

**Direct Appeal from the Circuit Court for Marion County**
**No. 3482     Buddy Perry, Judge**

---

**No. M2000-00087-CCA-R3-CD - Filed February 1, 2001**

---

The appellant, Charles A. Reynolds, was convicted by a jury in the Marion County Circuit Court of one count of first degree felony murder committed during the perpetration of a kidnapping or robbery and one count of especially aggravated kidnapping. The trial court imposed concurrent sentences of life imprisonment in the Tennessee Department of Correction for the felony murder conviction and fifteen years incarceration in the Department for the especially aggravated kidnapping conviction. On appeal, the appellant raises the following issues for our consideration: (1) whether the trial court erred in denying the appellant's motion for judgments of acquittal at the close of the State's case-in-chief; (2) whether the trial court erred in denying his motion for new trial in which he challenged the sufficiency of all the evidence underlying the jury's verdicts; and (3) whether the trial court erred in admitting evidence of another crime committed by the appellant on the night of the murder. Following a thorough review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Leonard M. Caputo, Chattanooga, Tennessee, Charles G. Jenkins, Sr., and Charles G. Jenkins, Jr., Jasper, Tennessee, for the appellant, Charles A. Reynolds.

Paul G. Summers, Attorney General and Reporter, David H. Findley, Assistant Attorney General, J. Michael Taylor, District Attorney General, and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On February 7, 1995, a Marion County Grand Jury returned an indictment charging the appellant, Charles A. Reynolds, with one count of first degree premeditated and deliberate

murder, one count of first degree felony murder committed during the perpetration of either a kidnapping or a robbery, one count of especially aggravated kidnapping, and one count of especially aggravated robbery. The indictment arose from the murder of Glendon F. Hicks, Jr., on July 17, 1993, following his forcible removal to a remote location where, over a period of several hours, he was beaten with a lug wrench, shot in the head with a rifle, and dragged by a car for at least two miles. The appellant's case proceeded to trial on August 14 and 15, 1995. The State declined to seek either the death penalty or a sentence of life imprisonment without parole for the murder charges.

At the appellant's trial, the evidence adduced by the State established that on July 16, 1993, at approximately 1:00 p.m., the appellant encountered his friend and co-defendant, Charles Godsby, Jr., at a gasoline station in Kimball, Tennessee. Godsby had just bought an "SKS" rifle, which he showed to the appellant. Godsby also invited the appellant "to go out [with him that evening] and mess around some." Upon consulting with his girlfriend, the appellant agreed.

At approximately 5:00 p.m., the appellant drove to Godsby's home, where he met both Godsby and Godsby's father (Godsby, Sr.). The appellant and Godsby accompanied Godsby, Sr., to a rock quarry, where they practiced shooting the SKS rifle. The appellant and co-defendant then borrowed a car belonging to Godsby, Sr., and drove to South Pittsburg and South Pittsburg Mountain, purchasing beer along the way. Later that evening, they also drove to Monteagle, initially stopping at the Hillbilly Restaurant. The manager, however, refused to serve alcohol to the eighteen-year-old appellant. Accordingly, at approximately 10:30 p.m. or 11:00 p.m., the appellant and Godsby drove to a bar in Monteagle named the "Caddy Shack," where the appellant was able to obtain beer.

At the Caddy Shack, the appellant and his co-defendant began to play pool. Sometime thereafter, Glendon Hicks and a companion joined them for a game of pool, insisting upon gambling money on the outcome of the game. A dispute developed over the amount of money at stake. Kendra Melton, another patron of the Caddy Shack, noticed the dispute. She recalled at the appellant's trial that

> [the appellant, Godsby, and Hicks were] kind of, I don't know, picking back and forth. Like [Hicks] was pretty well lit, and they would go by where he was setting on a flip thing from the bar. And they was kicking at him. And he just, I don't know, there was something over a pool game. I don't know what it was. [Hicks] slung balls across the table and said, "The game's over."
>
> Then [Hicks] . . . went up to [the appellant] and took chalk, the hand chalk and put [it] on top of [the appellant's] head and turned it around and [the appellant] . . . said, "You ought not to have done. That wasn't a smart thing to do." And [Hicks] took and popped [the chalk] right on top of [the appellant's] head and broke it into a million little pieces.

-2-

Additionally, Godsby began annoying one of the waitresses, Anna Lee Thomas, and Hicks intervened on her behalf. Thomas recalled at the appellant's trial that Godsby threatened to kill Hicks, and the appellant, who was standing nearby, "grinned." At some point, in an apparent attempt to diffuse tensions, Godsby bought Hicks a beer. After drinking the beer, Hicks went outside the bar into the parking lot, while the appellant and Godsby remained inside.

At approximately 12:15 a.m., the appellant and Godsby began arguing with one another. During this argument, Patsy Meeks, the bartender at the Caddy Shack, overheard Godsby declare to the appellant that "he would keep [Hicks] under control." Because the argument was disruptive, Meeks asked the appellant and Godsby to leave, and they went outside into the parking lot. As to the ensuing events in the parking lot and in Godsby, Sr.'s vehicle, the evidence adduced by the State at trial posed two possible scenarios.

One scenario was supported by the State's introduction into evidence of the appellant's statement on July 18, 1993, to William Barbrow, a special agent with the Tennessee Bureau of Investigation (T.B.I.). According to this statement, when the appellant and Godsby went into the parking lot of the Caddy Shack, Hicks provoked a fight with Godsby. During the fight, Godsby grabbed a lug wrench and hit Hicks in the head. Hicks fell to the ground, apparently unconscious, and the appellant and Godsby lifted Hicks and placed him in the backseat of their car. They then drove with the unconscious Hicks to Conservation Corp Lake on South Pittsburg Mountain.

A second scenario was supported by the testimony of the State's witnesses, Rodney Meeks and Allan Weeks. Rodney Meeks, who was the Caddy Shack bartender's son, testified at the appellant's trial that on July 17, 1993, sometime between midnight and 1:00 a.m., he encountered the appellant and Godsby in the parking lot of the Caddy Shack. According to Rodney, the two men were seated in a car. Specifically, the appellant was seated in the driver's seat of the car, and Godsby was seated in the front passenger's seat. The two men inquired whether Rodney wished to accompany them to a party, but Rodney declined their invitation. Soon thereafter, at approximately 12:50 a.m. or 1:00 a.m., Rodney observed Hicks enter the backseat of Godsby, Sr.'s vehicle and leave with the appellant and Godsby.

Allan Weeks, an investigator with the District Attorney's Office for the Twelfth Judicial District, testified concerning the appellant's statement to him on July 21, 1993. In this statement, the appellant indicated that Hicks entered Godsby, Sr.'s car voluntarily. The appellant further recounted that, upon leaving the parking lot of the Caddy Shack in Godsby, Sr.'s car and while Hicks was seated in the backseat, Godsby picked up a lug wrench and hit Hicks in the head, rendering him unconscious. The appellant and Godsby then drove with the unconscious Hicks to Conservation Corp Lake.

The State's evidence further established that, once at the lake, the appellant and Godsby turned off of the main highway onto gravel and dirt roads before stopping and removing

Hicks from the car. When Hicks began to regain consciousness, Godsby beat him with the lug wrench "all over his body." Afterwards, the appellant and Godsby began to leave the lake area, abandoning the unconscious Hicks. However, upon reaching the highway and driving toward South Pittsburg, they reconsidered and returned to Hicks' location. Hicks had again regained consciousness and was attempting to rise to his feet. Godsby removed his SKS rifle from his father's car, threw the weapon to the appellant, and hit Hicks once again with the lug wrench. When Hicks continued his attempts to stand, Godsby invited the appellant to shoot Hicks. The appellant fired a bullet into the ground beside Hicks before surrendering the rifle to his companion; Godsby shot Hicks in the head.

Godsby next stole Hicks' wallet, which contained only a few dollars. Additionally, Godsby removed Hicks' belt, wrapping one end around the victim's ankle and attaching the other end to the back of Godsby, Sr.'s car. The appellant and Godsby then drove back to the main highway, dragging Hicks' body behind them. They drove an additional one or one and one half miles down the highway toward South Pittsburg before stopping, detaching the body from the car, and rolling the body into a ditch.

While Godsby and the appellant were in the Conservation Corp Lake area on the night in question, they twice encountered a group of teenagers, who were camping alone beside the lake. During the first encounter, the appellant and Godsby drove by the teenagers' campsite and briefly spoke with them. During the second encounter, the appellant and Godsby were driving on the main highway and observed the teenagers leaving the lake area in their vehicles. Godsby, who was driving, asked the appellant to give him the SKS rifle. The appellant complied and also held the steering wheel while Godsby repeatedly fired the weapon at the teenagers' vehicles, forcing one of them off the road. When the occupants of the disabled vehicle fled, Godsby stole a cooler containing beer from the vehicle.

As daylight approached on the morning of July 17, the appellant and Godsby drove to the home of Godsby's grandmother, where they found Godsby's grandmother and his uncle. Godsby recounted to his family the events of the preceding night, and his family assisted him and the appellant in devising an alibi. Godsby's uncle also supplied cleaning materials to the appellant and Godsby, and the two drove to a car wash to clean Godsby, Sr.'s car. The two also stopped at a local market named "Favorite Market" and purchased something to eat before returning to Godsby's grandmother's home. The appellant slept there for several hours before departing.

On July 18, the appellant informed his father, Hobart Reynolds, and his uncle, Marvin York, about Hicks' murder. Reynolds and York then accompanied the appellant to the Marion County Jail, where the appellant provided the previously mentioned statement to Special Agent Barbrow. Again, the appellant did not deny to Barbrow his presence during, and some limited participation in, the kidnapping and murder of Glendon Hicks. Rather, he asserted that he cooperated with Godsby because he was afraid of Godsby, and because Godsby threatened him.

-4-

The appellant testified on his own behalf at trial. In contrast to both his statement to Barbrow and his statement to Investigator Weeks, the appellant now claimed that he could not recall the events in the parking lot of the Caddy Shack following his departure with Godsby from the bar. He could only recall awakening at some point and discovering that he was in the front passenger's seat of Godsby, Sr.'s car. Godsby was driving the car, and Hicks was lying unconscious in the backseat with his head "busted through." The appellant asked Godsby what had happened, but Godsby merely ordered the appellant to go back to sleep. The appellant complied and, when he next awakened, they were at Conservation Corp Lake. At the Lake, according to the appellant, Godsby beat Hicks with the lug wrench for at least thirty or forty minutes before shooting him in the head with the SKS rifle. Overall, the kidnapping and murder of Glendon Hicks spanned a period of approximately five hours. The appellant claimed that he was intoxicated at the time of these offenses. Primarily, however, he again asserted that he cooperated with Godsby at the lake and thereafter because he was afraid of Godsby.

In addition to his own testimony, the appellant presented the testimony of his uncle, Marvin York, and an acquaintance, Paul Williams. York testified that, prior to these offenses, the appellant possessed a reputation as a peaceful and honest boy. Williams similarly testified that the appellant possessed a reputation as a "good kid."

As to Godsby, the parties agreed to the following stipulation at the appellant's trial: On December 13, 1994, Godsby pled guilty to the first degree murder of Glendon Hicks and received a sentence of life imprisonment in the Tennessee Department of Correction. Godsby also pled guilty to especially aggravated robbery and received a sentence of fifteen years incarceration in the Department. The trial court ordered consecutive service of Godsby's sentences. Additionally, both Godsby and the appellant were charged with attempt to commit second degree murder. Godsby pled guilty to attempted second degree murder and received a sentence of twelve years incarceration in the Department, which sentence was to be served concurrently with the sentence for especially aggravated robbery.

At the conclusion of the appellant's trial, the jury acquitted the appellant of first degree premeditated and deliberate murder and especially aggravated robbery and returned verdicts of guilt of one count of first degree felony murder committed during the perpetration of a kidnapping or robbery and one count of especially aggravated kidnapping. The trial court imposed concurrent sentences of life imprisonment in the Tennessee Department of Correction for the felony murder conviction and fifteen years incarceration in the Department for the especially aggravated kidnapping conviction.

## II. Analysis
### a.      Motion for Judgments of Acquittal

On appeal, the appellant first contends that, with respect to his convictions of both first degree felony murder and especially aggravated kidnapping, the trial court erroneously denied his motion for judgments of acquittal at the conclusion of the State's proof. A trial court must grant a motion for a judgment of acquittal at the close of the State's proof if the evidence is legally

insufficient to sustain a conviction of the charged offense. Tenn. R. Crim. P. 29. In making this determination, the trial court may not address the weight of the evidence but must afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence, and must discard any countervailing evidence. State v. Blanton, 926 S.W.2d 953, 957-958 (Tenn. Crim. App. 1996); State v. Price, No. E1999-02684-CCA-R3-C, 2000 WL 1015914, at *25 (Tenn. Crim. App. at Knoxville, July 25, 2000). This standard is applicable to direct evidence, circumstantial evidence, or a combination of both. State v. Hall, 656 S.W.2d 60, 60-62 (Tenn. Crim. App. 1983); State v. Willis, No. 01C01-9802-CC-00068, 1999 WL 510602, at *7 (Tenn. Crim. App. at Nashville, July 15, 1999), perm. to appeal denied, (Tenn. 2000); cf. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). Moreover, an appellate court applies the same standard as the trial court when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); see also State v. Smith, No. 02C01-9506-CR-00157, 1999 WL 162958, at *2 (Tenn. Crim. App. at Jackson, March 25, 1999).

With respect to the appellant's conviction of felony murder, Tenn. Code Ann. § 39-13-202(a)(2) (1993) defined first degree felony murder, in relevant part, as "[a] reckless killing of another committed in the perpetration of . . . any . . . robbery [or] . . . kidnapping." Our legislature has defined robbery, in turn, as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (1997). Kidnapping is the knowing and unlawful removal or confinement of another "so as to interfere substantially with the other's liberty" and "[u]nder circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a)(1) (1997); Tenn. Code Ann. § 39-13-302(a) (1997). An "unlawful" removal or confinement is defined as "one which is accomplished by force, threat or fraud." Tenn. Code Ann. § 39-13-301(2) (1997). With respect to the appellant's conviction of especially aggravated kidnapping, kidnapping is especially aggravated when the victim has suffered serious bodily injury. Tenn. Code Ann. § 39-13-305(a)(4) (1997).

In prosecuting the appellant for both felony murder and especially aggravated kidnapping, the State in this case proffered to the jury the theory of criminal responsibility for the conduct of another. A defendant may be found criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [he] solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997). Thus,

"[i]n order to aid and abet another to commit a crime, it is necessary that [the] accused in some sort associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree; the same criminal intent must exist in the minds of both."

State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997)(quoting Jenkins v. State, 509 S.W.2d 240, 245 (Tenn. Crim. App. 1974))(alteration in original).

Although a defendant's mere presence during the commission of a crime will not render him criminally responsible for the conduct of another, "[n]o *particular* act [by the defendant] need be shown." State v. Jones, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999)(emphasis added); see also State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). In other words, it is not necessary that the defendant took physical part in the crime; "[e]ncouragement of the principal is sufficient." Jones, 15 S.W.3d at 890. Moreover, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." Ball, 973 S.W.2d at 293.

In challenging the trial court's denial of his motion for judgments of acquittal, the appellant argues that the State failed to establish beyond a reasonable doubt his guilt of kidnapping. According to the appellant, his guilt of kidnapping was a necessary prerequisite to *both* his convictions of felony murder and especially aggravated kidnapping. We initially note that the State charged the appellant with first degree felony murder committed during the perpetration of either a kidnapping or a robbery. However, the appellant asserts in his brief that, "had the jury returned a verdict of felony murder in conjunction with aggravated robbery, perhaps the trial court could have approved the [felony murder] verdict due to the fact that the co-defendant . . . took two dollars from the wallet of the victim after the homicide. However, by its verdict, the jury found [the appellant] not guilty of especially aggravated robbery."

It has long been held in Tennessee that consistency between verdicts on separate counts of an indictment is not necessary. Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973). In other words, "[i]f satisfied that the proof established guilt of the offense upon which the convictions were returned, courts will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning." State v. Bivens, No. E1999-00086-CCA-R3-CD, 2000 WL 968789, at *7 (Tenn. Crim. App. at Knoxville, July 14, 2000). Thus, the jury's effective acquittal of the appellant of robbery for one count of the indictment did not necessarily preclude the jury's conviction of the appellant of felony murder committed during the perpetration of a robbery for another count.

Nevertheless, the appellant's argument raises an issue that has been ignored by the parties, both at trial and in their briefs on appeal, and that may be subject to plain error analysis according to the standard first enunciated by this court in State v. Adkisson, 899 S.W.2d 626, 641-642 (Tenn. Crim. App. 1994), and later adopted by our supreme court in State v. Smith, 24 S.W.3d 274, 282-283 (Tenn. 2000). In Smith, 24 S.W.3d at 282 (citing Adkisson, 899 S.W.2d at 641-642), our supreme court approved the consideration of the following five factors in determining whether trial error rises to the level of "plain error":

> "(a) [T]he record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

The court emphasized that the presence of all five factors must be established by the record, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. at 283. In short, "[t]he plain error rule is to be used sparingly by this court and invoked only in exceptional circumstances in which an error has had 'an unfair prejudicial effect which undermined the fundamental fairness of the trial.'" State v. Newmon, No. W1999-01497-CCA-R3-CD, 2000 WL 1156688, at *9 (Tenn. Crim. App. at Jackson, August 4, 2000)(quoting Adkisson, 899 S.W.2d at 639, 641-642).

In State v. Lemacks, 996 S.W.2d 166, 171 (Tenn. 1999), our supreme court recently emphasized that "[t]he right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based upon a single criminal occurrence." Cf. State v. Keen, 31 S.W.3d 196, 208-210 (Tenn. 2000). However, the court also reaffirmed that

> questions of jury unanimity may arise in cases where an accused is indicted and prosecuted for a single offense, but the jury is permitted to consider multiple criminal acts of the type which, if found beyond a reasonable doubt, would each support a conviction of the charged offense. To avoid a "patchwork" verdict of guilt in those cases, the trial judge must "augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts."

Lemacks, 996 S.W.2d at 170 (citations omitted). In State v. Young, No. 01C01-9605-CC-00208, 1998 WL 258466, at *1 (Tenn. Crim. App. at Nashville, May 22, 1998), this court engaged in plain error analysis under Adkisson in its application of the above principle in the context of an indictment charging the defendant with felony murder committed during the perpetration of either a rape or an attempted rape. The rape and attempted rape referred to two distinct and separate sexual offenses, the rape referring to the defendant's digital penetration of the victim's anus and the attempted rape referring to the defendant's attempted penile penetration of the victim. Id. at *4. The trial court failed to provide an augmented unanimity instruction to the jury, and the jury's felony murder verdict did not reflect the predicate felony. Id. Accordingly, this court noted that the indictment, the jury instructions, and the verdict had raised the specter of a patchwork verdict. Id. at *5. Nevertheless, we concluded that any error was harmless under the particular facts of that case. Id.

Similarly, in the instant case, the indictment offered to the jury, in the alternative, two distinct and separate felonies upon which to predicate the appellant's guilt of felony murder. Moreover, the trial court did not provide to the jury an augmented unanimity instruction "to ensure that all twelve jurors agreed on the same set of facts for the underlying felony," id. at *4, nor did the jury specify the predicate felony in its felony murder verdict. Nevertheless, as in Young, id. at *5, we conclude that there was no real potential in this case for a non-unanimous verdict. Rather, regardless of whether some or all of the jurors found that the appellant recklessly killed during the commission of a robbery, the jurors did unanimously find, by their verdict of guilt of especially aggravated kidnapping, that the appellant recklessly killed during the commission of a kidnapping.

Accordingly, under the particular facts of this case, any error was harmless beyond a reasonable doubt.[1]

We now address the appellant's complaint that the State failed to prove beyond a reasonable doubt the appellant's guilt of kidnapping. The appellant rests his complaint upon the State's failure to adduce any "independent direct testimony that Glen Hicks was either abducted or forced into [Godsby, Sr.'s] automobile" at the Caddy Shack. Moreover, the appellant asserts that the State failed to adduce evidence that the appellant was criminally responsible for any conduct by his co-defendant.

First, we have already noted the State's introduction into evidence of the appellant's statement to Special Agent Barbrow that Hicks was forcibly placed in Godsby, Sr.'s car. However, the State also introduced into evidence the appellant's statement to Investigator Weeks that Hicks entered the car voluntarily. "The rule of law in Tennessee is that contradictory statements made by a witness as to the same fact can cancel each other out." State v. Caldwell, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997).

> "The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies. But if the proof of the fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way."

State v. Matthews, 888 S.W.2d 446, 449-450 (Tenn. Crim. App. 1993)(quoting Johnston v. Cincinnati, N. O. & T. P. Ry. Co. et al., 240 S.W. 429, 436 (Tenn. 1922)). That having been said, we have previously observed that the above "rule of cancellation" applies only to two *sworn* statements. State v. Bennett, No. 01C01-9607-CC-00139, 1998 WL 909487, at *5 (Tenn. Crim. App. at Nashville, December 31, 1998); see also Brown v. Georgia Life and Health Insurance Company, No. 1173, 1986 WL 7435, at *3 (Tenn. App. at Jackson, July 1, 1986). Agent Barbrow testified that he possessed "the authority to put someone under oath and take a sworn statement" and that the appellant's statement to him was, in fact, a "sworn statement." In contrast, the evidence adduced at trial suggests that the appellant's statement to Investigator Weeks was not a sworn statement.

In any event, even if the appellant had made both statements under oath, the appellant would not be entitled to relief. The "rule of cancellation" applies only when the inconsistency in the witness' testimony is unexplained and when neither version of his testimony is corroborated by other

---

[1]Our conclusion is buttressed by the jury's submission of the following question to the trial court during deliberation: "Without evidence to prove the defendant pulled the trigger, can we return a verdict of felony murder if we believe he participated in the kidnapping which resulted in Hicks death?"

evidence. Caldwell, 977 S.W.2d at 118; Matthews, 888 S.W.2d at 450. In this regard, we agree with the appellant that the "totally independent and unimpeached" testimony of Rodney Meeks corroborated the appellant's statement to Weeks concerning Hicks' voluntary entry into Godsby, Sr.'s car. However, we disagree with the appellant that his guilt of kidnapping depended upon the State's presentation of evidence refuting Hicks' voluntary entry into the car.

Again, kidnapping requires the knowing and unlawful removal or confinement of another "so as to interfere substantially with the other's liberty" and "[u]nder circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a)(1); Tenn. Code Ann. § 39-13-302(a). An "unlawful" removal or confinement is "one which is accomplished by force, threat or fraud." Tenn. Code Ann. § 39-13-301(2). The State's evidence established and, indeed, it was undisputed at trial that, regardless of whether Hicks initially entered Godsby, Sr.'s car voluntarily or involuntarily, he was forcibly held in the car by virtue of being struck in the head with a lug wrench and was thereby transported to Conservation Corp Lake. At the lake, Hicks was further detained for a significant period of time, during which he was beaten with the lug wrench, shot in the head, and dragged by a car for several miles.

The sole dispute at trial concerned the role of the appellant in the commission of the offenses, namely whether the appellant shared his co-defendant's criminal intent and whether any participation by the appellant in the offenses resulted from duress. On appeal, the appellant asserts that "there was simply no proof before the jury, that [the appellant] had any knowledge that [Godsby] would attack the victim as he sat in the backseat of the vehicle." We must disagree. In all criminal cases, the one element which is most often proven by circumstantial evidence is the culpable mental state of the defendant. State v. Smith, No. 02C01-9602-CR-00051, 1997 WL 291179, at *3 (Tenn. Crim. App. at Jackson, June 3, 1997). The State in this case adduced strong circumstantial evidence that the appellant shared his co-defendant's criminal intent. To briefly recapitulate, the State established at the appellant's trial that Hicks quarreled with both the appellant and Godsby at the Caddy Shack. Indeed, Hicks humiliated the appellant by crushing chalk on his head in addition to interfering with Godsby's attempt to flirt with one of the waitresses. While the appellant was present and with his apparent approval, Godsby threatened to kill Hicks. Moreover, before leaving the bar, Godsby was overheard reassuring the appellant that "he would keep [Hicks] under control." Later, the appellant assisted Godsby, at a minimum, by driving Godsby, Sr.'s car to Conservation Corp Lake with the unconscious Hicks inside, by firing Godsby's rifle in the direction of Hicks' head as the victim attempted to rise to his feet during his ordeal at the lake, by providing the rifle to Godsby with the knowledge that Godsby desired to shoot Hicks, and by cleaning Godsby, Sr.'s car following the commission of the instant offenses. In short, the State adduced overwhelming evidence of the appellant's guilt, not only of kidnapping but also of the charged offenses. This issue is without merit.

b.    **Motion for New Trial**
The appellant additionally asserts that the trial court erred in denying his motion for new trial in which he challenged the sufficiency of all the evidence underlying the jury's verdicts. Under Tenn. R. Crim. P. 33(f), a trial court may grant a defendant a new trial following a verdict of

guilty if it disagrees with the jury about the weight of the evidence. However, as in resolving issues predicated upon the grant or denial of a motion for judgment of acquittal following the State's case-in-chief, this court will not re-weigh the evidence adduced at trial when reviewing the trial court's denial of a motion for new trial at the close of all the proof. Rather, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). Accordingly, the burden is upon the appellant to establish that no "reasonable trier of fact" could have found the essential elements of the charged offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e).

We have previously concluded that the evidence adduced by the State overwhelmingly established the appellant's guilt of the charged offenses. A further review of the evidence adduced by the appellant does not require a different result. Because the appellant has failed to carry his burden, this issue is likewise without merit.

**c.    Tenn. R. Evid. 404**

Finally, the appellant complains that the trial court erroneously introduced evidence concerning the attempted shooting of the teenagers at Conservation Corp Lake on the night of Hicks' murder. On appeal, the appellant predicates his complaint wholly upon Tenn. R. Evid. 404(b). We must agree with the State that the appellant has waived this issue for purposes of appellate review.

In this regard, we are initially struck by the appellant's entry into a stipulation with the State that, in addition to the charges currently before the jury, the appellant had been charged with attempt to commit second degree murder. Moreover, at no time prior to trial did the appellant seek the redaction of his statement to Special Agent Barbrow of the T.B.I., in which the appellant extensively referred to the shooting incident. Also, the appellant failed to object to testimony by Stacy Williams, a trooper with the Tennessee State Highway Patrol, that in the early morning hours of July 17, 1993, in the Conservation Corp Lake area, the occupants of a vehicle matching the description of Godsby, Sr.'s were shooting at the teenagers' vehicles. The sole objection proffered by the appellant to the introduction of evidence concerning the attempted shooting of the teenagers occurred during the testimony of Amanda Baker, one of the teenage victims. Not only did this objection come too late, but the appellant apparently based his objection on the relevance of the testimony, or lack thereof, rather than, more specifically, on Tenn. R. Evid. 404(b). Defense counsel stated, "We'd like to interpose an objection to the relevance of this. This man is not being charged with that particular case. He's being charged with first degree murder."

Despite the appellant's failure to cite Rule 404(b), the State acknowledged that the testimony described "other bad acts" and argued that the testimony was nevertheless admissible "to show that [the appellant] was cooperating and participating in all these criminal activities" and "to show the whole story." The trial court agreed with the latter justification and provided the following instruction to the jury:

I'm overruling the objection and I'm going to allow some testimony that may relate to other bad conduct on behalf of the defendant and/or co-defendant. I'm allowing this testimony in to allow you to get a complete view of the circumstances that existed on this night. I need to caution you and I will charge you at the conclusion of the case, however, that proof of other bad acts is not proof that the charge that the defendant is indicted for necessarily occurred, and you may not consider this testimony as substantive proof on that issue. I am allowing it solely for you to get a picture of what occurred on this particular night.

The trial court provided a similar instruction to the jury immediately prior to the jury's deliberation.

Tenn. R. Evid. 103(a)(1) provides that "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context." Arguably, the more specific Rule 404(b) objection to the disputed testimony in this case was "apparent from the context." However, we note that the appellant never requested a jury-out hearing in accordance with Rule 404(b). "As the rule indicates, the trial court was not obligated to conduct such a hearing absent a request." State v. Hall, 958 S.W.2d 679, 707 (Tenn. 1997). Moreover, in his motion for new trial, the appellant again failed to base his objection to the disputed testimony upon Rule 404(b), instead relying upon Tenn. R. Evid. 403.

In sum, assuming that the appellant's Rule 404(b) objection was not apparent from the context, "a party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." Adkisson, 899 S.W.2d at 634-635; see also State v. Korsakov, E1999-01530-CCA-R3-CD, 2000 WL 968812, at *11 (Tenn. Crim. App. at Knoxville, July 13, 2000); State v. Harper, No. M1999-00451-CCA-R3-CD, 2000 WL 739672, at *2 (Tenn. Crim. App. at Nashville, June 9, 2000); State v. Shropshire, No. 03C01-9303-CR-00078, 1994 WL 421395, at *2 (Tenn. Crim. App. at Knoxville, August 12, 1994). Alternatively, if the specific ground was apparent, "[f]ailure on the part of [a] defendant to raise an issue [in] his motion for new trial requires waiver." State v. Perry, 13 S.W.3d 724, 739 n.3 (Tenn. Crim. App. 1999). Accordingly, the appellant's Rule 404(b) objection has been waived, and this court will not address it absent plain error. Tenn. R. Evid. 103(d); Tenn. R. Crim. P. 52(b); Smith, 24 S.W.3d at 282-283. For reasons discussed below, we decline to exercise our discretion to recognize plain error in this case. Tenn. R. Crim. P. 52(b).

Evidence that a defendant has committed crimes, wrongs, or acts, other than those crimes for which he is being tried, is not admissible to prove his character and thereby show action in conformity with the character trait. Tenn. R. Evid. 404(b); see also Hall, 958 S.W.2d at 707. Nevertheless, such evidence is admissible under Rule 404(b) if it is relevant to a material issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect. Hall, 958 S.W.2d at 707. Material issues include identity, motive, common scheme or plan, intent,

or the rebuttal of accident or mistake defenses. Id. Additionally, contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be admitted consistent with Rule 404(b). State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000). However, the trial court must make the following findings prior to admitting such contextual background evidence:

(1) [T]he absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Id.

Of course, if the evidence of other crimes, wrongs, or acts does not clearly and convincingly establish that the defendant was the perpetrator, its admission is governed wholly by Tenn. R. Evid. 401, 402, and 403. State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997). Under the particular facts and circumstances of this case, consideration of this preliminary question underscores the absence of plain error.

As previously noted, it was undisputed at trial that the appellant was present during the commission of the charged offenses and, moreover, that the appellant participated to some extent in these offenses. The only issues concerning the appellant's guilt of these offenses were whether the appellant and his co-defendant possessed the same criminal intent and whether any participation by the appellant in the offenses resulted from duress. The resolution of these issues depended largely upon the jury's assessment, in the face of strong circumstantial evidence to the contrary, of the appellant's claims that he was an unwilling participant in the offenses.

It was also undisputed at trial that the appellant was present during, and participated to some extent in, the attempted shooting of the teenagers. Moreover, the charged offenses and the attempted shooting of the teenagers were part of the same criminal transaction. Indeed, the jury reasonably could have inferred from the evidence adduced by the State that the attempted shooting of the teenagers was an effort, albeit ineffectual, to eliminate possible witnesses to the kidnapping and murder of Glendon Hicks. Thus, the appellant's claims that he was an unwilling participant in the charged offenses applied with equal force to his participation in the attempted shooting of the teenagers. In other words, because the charged offenses and this "other crime[], wrong[], or act[]" were part of the same criminal transaction, the appellant's presence during and participation in the latter neither negated nor strengthened the credibility of his assertions concerning his unwilling participation in the former or vice versa. Cf. Gilliland, 22 S.W.3d at 272.

Accordingly, the appellant's participation in the attempted shooting of the teenagers was irrelevant to any material issue at trial. We also conclude that the absence of the disputed testimony would not have created a chronological or conceptual void in the State's presentation of its case, resulting in significant jury confusion about a material issue or evidence in the case. Gilliland, 22 S.W.3d at 272. Yet, a primary cause of the inadmissibility of the disputed testimony also renders the consideration of any error unnecessary to the attainment of substantial justice, as it

is does not affirmatively appear that the jury's assessment of the appellant's claims concerning his unwilling participation in the charged offenses was affected by his participation in other offenses that were part of the same criminal transaction. Smith, 24 S.W.3d at 282; see also Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). Moreover, we have already noted that the evidence, including the circumstantial evidence, of the appellant's guilt of the kidnapping and murder of Glendon Hicks was overwhelming. Id. Finally, under the facts and circumstance of this case, we will presume that the jury followed the limiting instructions of the trial court. State v. Cauthern, 967 S.W.2d 726, 744 (Tenn. 1998); State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). This issue is without merit.

### III.  Conclusion
For the foregoing reasons, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE